Also, 23-2995 from the District of Minnesota, Anita Miller v. the Mayo Clinic, and 23-2996 from the District of Minnesota, Shelly Keel v. Mayo Clinic Health System, and 23-2997 from the District of Minnesota, Sherry Eide v. the Mayo Clinic, and 23-2999 from the District of Minnesota, Kristen Rubin v. the Mayo Clinic. Thank you. Mr. Erickson. We appreciate the Court's patience, but as you know, this case has affected a lot of people, and about 80 people drove up from Rochester this morning to hear this argument. May it please the Court, Counsel, my name is Greg Erickson from Mormon Cardinal and Erickson, and I'm here on behalf of Plaintiffs Ken Ringhofer, Anita Miller, Shelly Keel, Sherry Eide, and Kristen Rubin, as well as 100 more or so other similarly situated plaintiffs whose cases will be dramatically affected by the court's decision. The court's ruling on these five cases. Today, our friend from the EEOC, Mr. McCachren, is going to address the appeals for Mr. Ringhofer and Ms. Keel, and I'm going to try to take my initial five minutes to address the appeals of Ms. Miller and Ms. Eide and Ms. Rubin. Anita Miller, like Appellant Ringhofer and Keel, was subject to Mayo's COVID-19 vaccine mandate. Ms. Miller submitted an objection detailing her very sincerely held religious beliefs, which conflicted with the vaccination requirement. Mayo denied her request and denied her appeal. One of the most important things I want the court to note is in our pleadings, it notes specifically that these are, one, medical professionals, not lawyers, and they were given 48 hours without delivered notice to do their appeals. Imagine that. You have kids, you have a job, et cetera, and then they have 48 hours to do that appeal. They are given absolutely zero individuality. Is there a case that takes those sort of facts into account? What case is your best case that says? Your Honor, to be honest with you, I do not have a case specifically. I'm just asking the court to apply a reasonableness standard. So this would be a new standard that we're applying in this case? Yes. Because, I mean. And it would apply in every case going forward? Or what are the contours of the reasonableness that you would suggest that we apply here? Well, I can assure you that when your job is on the line, okay, I believe that notice should be hand-delivered, not emailed. Counsel, is this relevant to the key issues here? Your time is limited. Go ahead. No, I understand. Proceed. Okay. Let me just jump ahead. The main thing that I want to address is the exhaustion requirement with respect to Ms. Miller and Ms. Eady. What's going on here, Your Honor, is that the district court had a position that the fact that Ms. Miller and Ms. Eady objected after denial of their religious exemptions and before the termination, that invalidated their claims and the court threw out their case for lack of exhaustion of administrative remedies. But we've found before that termination requires an additional complaint. They'll recharge, haven't we? No, Your Honor. Actually, the case that's in our brief and that I'd like to refer you to is the case Weedoe v. City of St. Louis. And in that case, it said, In light of the Supreme Court's clear rejection in Morgan of the continuing violation theory as a means to toll the limitation period for discrete acts of discrimination that occurred prior to the limitation period for a timely file charge, some courts have concluded the rule applies with equal force to discrete acts of discrimination that occur subsequent to a timely filed EEOC charge. These courts require a new or amended EEOC charge for each subsequent alleged incident of retaliation or discrimination, regardless of whether the subsequent acts are related to the allegations of the initial timely filed EEOC charge. While our court has narrowed its view of what subsequent acts are sufficiently related to be within the scope of a properly filed administrative charge, we have not wholly abandoned the theory that a reasonably related subsequent act may be considered exhausted. You know, I think that there may be some validity to that, but there does seem to be some indication that when termination occurs, we do seem to require just, I mean, nobody's ever come out and said, When there's a termination, you have to refile, that you have to file within 180 days. And in this case, I think it's indisputable that no claim was ever filed within the 180 days of termination. Now, I may be just reading the tea leaves out here, because when you look at the cases themselves, it seems that's what the district courts are generally doing, is they're saying, Yeah, termination, it changes the nature of the claim. Well, let me just say, with respect to this particular case, all of these plaintiffs received written notice, you're denied, and you're going to be fired by this date. Okay? For example, the case of St. Cloud, it's the St. Cloud case. Basically, that case, now, that is pre-Morgan, but that case held that when you received, when the professor received the notice that his tenure was not going to be renewed, what happened then? That court found that the clock started ticking. Okay? Well, obviously, subsequently in Morgan, they found that each discrete act can, you know, basically be the basis of a charge, no question. But the reality is, in this particular case, there was nothing that the EEOC could have discovered in the intervening 30 days, because everything necessary for the termination had been done. The religious objections were denied, and they were in a position that there was nothing to do other than time to tick. What could the EEOC have found? So, essentially, your argument there sounds like you're applying to the old common law maxim that the law does not require one to perform useless acts. And at this point, it had already been presented to the EEOC, and the termination itself is no longer an operative fact, because you had an allegation that you would be terminated. And the determination itself put that clock in play, and the complaint that had been filed necessarily encompasses the termination. 100 percent. Okay. And to be honest with you, I need to reserve the rest of my time for rebuttal. Okay. Thank you. Mr. McEachran. Thank you, and good morning. Jim Driscoll McEachran on behalf of the EEOC as amicus. We ask the Court to correct the unduly narrow interpretations of religion and notice that the district court used to dismiss the Title VII claims of Keele and Ringhofer in this case. Both Keele and Ringhofer pled that they belonged to a religious faith, Christian for Keele, a Baptist who was raised Catholic for Ringhofer, and that they opposed abortion, and that through that, they opposed the use of vaccines that were produced or developed with fetal cell lines. On a motion to dismiss, that should have been enough. Title VII uses a broad and inclusive definition of religion. And on a motion to dismiss, all facts pled in the complaint are taken as true, and, of course, all inferences are taken in the plaintiff's favor. When you combine that inclusive definition of religion with that relatively figurative pleading standard, you set a low threshold for pleading religion. Is it no threshold if you claim religion and have a few right words? No, Your Honor. There is a threshold. You do have to plead a modicum of facts to Do you think in modern times, after the most recent cases, do you think that at the motion to dismiss stage, do you believe that there can be any case where you do say that there's not a religion, a religious objection? Your Honor, I don't think you have to reach the sort of outskirts of the definition of religion in this case. We cited cases in our briefs that address very similar objections to those raised here, the fetal sign line objection and the body of the temple objection. And those are plausibly alleged here. I want to highlight in the time we have a couple of the really precise errors that the district court made. For example, it inferred that Kiel's belief was not religious because other Christians who oppose abortion are willing to take the vaccine. And on Ringhofer's claim, the district court ignored Mr. Ringhofer's fetal cell line objection, apparently concluding that other allegations in the complaint were secular or personal preferences. But even at summary judgment or at trial, a plaintiff is not required to plead or prove, excuse me, that all members of their faith share their religious belief or that there is absolutely no overlap between a religious belief and a personal or secular belief. And again, of course, we're here on a motion to dismiss. Does the EEOC think the Africa factors are relevant at all for a district court in analyzing the bona fide religious beliefs at a motion to dismiss or at summary judgment? Your Honor, we refer to the Africa factors in our compliance manual, section 12. Those factors were originally set out by the Third Circuit to assess whether or not a set of beliefs is a religion, not whether a particular belief is religious. And we think that difference matters, because if you look at those factors, particularly as they're originally articulated by Judge Adams in the Monument of Concurrence, it's an establishment clause context, and we're looking to see whether a set of beliefs taken as a whole are a religion. And I want to really emphasize that third factor, that external signs of a religion. That's a very poor fit for trying to decide if an individual belief is religious. Judge Adams looked at whether they're holy days. In Africa, they looked at whether those ministers. Those are questions you can ask about whether something, a nontraditional religion meets the concept of a religion. But they're less useful in determining whether a specific belief is religious. Once we accept that there's no orthodoxy requirement, then don't we just have to say, you know, unless it's patently absurd that religious belief can be outside of whatever orthodoxy, and it's not our job as judges to decide what's an orthodox position and what isn't. That's correct. Since the Supreme Court's decision in Seager and Thomas and Welsh, we've not looked to whether the belief is true or correct. We look just whether it serves a place in the individual's life akin to that of religion in more traditional faith. And then they hold the belief in good faith, right? That's right. That's it. Now, do you have anything to do with Rubin? Because the only reason I ask is Rubin seems to be in a sort of different place because Rubin says, essentially, I don't believe in allowing testing of my body when it's not necessary, which doesn't really seem to be a religious belief and doesn't seem to be a claim of a sort of personal moral belief that is akin to a religious precept. It just seems to be, I just don't believe in this. Your Honor, we did not take a position on any claims other than Keel and Ringhoff. I see my time is up. You didn't take a position on the failure to exhaust, did you? No, we did not, Your Honor. Any guidance you want to give the Court on failure to exhaust? No, Your Honor. I'm only authorized to represent the EC on the issues in our brief. Just take a swing at it. We won't tell. Yeah, we won't tell. You beat me to the line. I was going to say that, too. If I may, I know my time has run out. We did also weigh in on notice, and the district court here required far too many factual specifics on notice. The ultimate burden on notice is to just prove that the employer is aware that there is a conflict between a religious belief and an employment requirement. At this stage, you only have to plausibly infer that. And here, both Keel and Ringhoffer allege there is a process for religious accommodations. They complied with that process and may acknowledge that process. Thank you, Your Honor. Thank you for the amicus points. Ms. Robins. And the podium does lower if you want to try it. If you want to try it, it's up to you. I'm familiar with this. Good. It's up to you. No, it's entirely up to you. Yeah. I'm a little vertically challenged. Good morning, Your Honors. May it please the court and counsel. My name is Holly Robins. I'm here from Littler Mendelson, and I'm representing the appellees, Mayo Clinic, Mayo Clinic Health System, Southeast Minnesota, and Mayo Clinic Ambulance, which I'll refer to collectively as Mayo. And we ask that the district court's decision in this case be confirmed. In the fall of 2021, in the face of a deadly pandemic, Mayo, a medical provider, a premier medical provider, instituted a COVID-19 vaccine policy. And that policy was driven by Mayo's desire to contribute to this health and safety of its employees, its patients, and the community. And it was informed also by the CMS mandate. And that policy required vaccination against COVID-19, but allowed employees to seek exemptions based on disability or on sincerely held religious beliefs that conflicted with the policy. And employees who received exemptions were expected to test, mask, social distance, and take other precautions. And two of the five appellants here today actually received vaccine exemptions. So Mayo did grant these. There are five appellants at issue here today, not 100. And what we need to look at are their specific complaints and what they have actually alleged. As I said, Mayo granted a vaccination exemption to appellants Sherry Eady and Kristen Rubin. They then refused to test, and ultimately their employment was terminated. Ms. Kiel, Ms. Miller, and Mr. Ringhofer were denied vaccine exemptions under the policy, and ultimately their employment was also terminated. So let's talk about Ms. Kiel. I mean, I think the concern is, at least by your friends on the other side, that the district court did too much probing into the nature of these religious beliefs. So my recollection on Kiel is the claim was the body is a temple sort of claim. And my recollection is the district court essentially said, well, okay, but that's not inconsistent with taking a vaccine and cited a case from out of circuit. Isn't that exactly the kind of wang? It's like, well, her religion couldn't really mean that. Whereas Kiel is saying my religion means I can't take a vaccine. And what the district court did, arguably, is assessed the genuineness and scope of those religious beliefs at a motion to dismiss. Now, why is that? Why was that the right thing? So looking at Ms. Kiel and the pleading standards under Iqbal and Twombly, the complaint, first of all, can't contain just mere conclusions of law. And the appellants must plausibly plead a cause of action. And that includes in pleading a religious belief here, that includes not only that they have a religious belief, which Mayo isn't really disputing, whether they're Christian or Catholic or Baptist. Mayo is looking at the particular belief in question and saying, is there any connection that can be reasonably drawn, that can be plausibly drawn from what has been pledged? And here the district court said, no, that's a safety concern. It's not a religious concern. I think in looking at Ms. Kiel specifically with respect to the question of her saying my body is a temple, I think there's a gap there. She states my body is a temple, and then she states I don't want to be vaccinated. She says it's a violation to put impure products into her body. It's a violation of her religious principles. And the district court says, I don't think so. She actually said more than that, because she said that my body is a temple, I have a religious belief, and then she explained how that religious belief impacts her decision. And she says all of the vaccines are produced or tested with cells from aborted human beings, and that's morally repugnant. Now, how can that not be plausibly pled? I mean, think about the facts. We say I believe that my body is a temple. I have a religious belief that abortion is a moral evil. I have a religious belief that these vaccines are the product of testing involving aborted fetuses. I mean, what more detail would you have them allege? I think there are a few issues here. One, when we're looking at this question of aborted human fetuses, what Ms. Keele specifically pled was that they were produced or tested with cells from aborted human babies, which is not accurate. And so she's basing this. Well, if not accurate, it's a question of fact, right? And it goes on to say receiving the vaccine would make her a participant in the abortion of that killed unborn baby, right? It is not a question of fact because there is a distinction between aborted human fetuses and aborted stem cell lines. And so you think that that's not — you think that's a religious belief that one needs to plead. It's not otherwise sufficiently pled. I mean, you know, people of certain religious beliefs have said for nearly 30 years that stem cells developed from an aborted fetus and those stem cell lines, some which go back 30 or 40 years even at this point, that that is a moral violation of the code. And, you know, that's doctrinally a moral violation from some churches because in hierarchical churches there are members with ecclesiastical authority who have said that, right? And so now what you're saying that because if you belong to that church, then you would have to have been adequately pled, but if you have a — like if you're going to an evangelical free church or just a free church generally or have just your own spiritual belief that that would not be adequately pled, is that really the position you want to take? Your Honor, I do take the position that the words are important and the specifics of this are important, and there's a distinction between aborted human babies and fetal stem cell lines. There is a distinction between those two things. Well, is there a moral — I mean, the claim is for the plaintiff there's not a moral distinction, right? But this, as Mr. Erickson said, these are all medical people, and they're pleading things that we should be able to — Wait a minute. Do you have a special standard for medical people who plead in medical cases? There is not. Where's that case? There is not. But there is a distinction, I think, between using the right language and — Well, I mean, to me, that's an argument you can make later in the case. But on a motion to dismiss, we're looking at the sufficiency of the plea. I get your position. It just seems to be you're applying a much higher burden than we have in the past. And that's my broader concern here. I mean, what changed? I get that COVID's out there, but no circuit court, Supreme Court hasn't said, well, because there's a national emergency here, we're going to lower the pleadings or raise the pleading standards for religious exemptions. And that is what it looks like, respectfully, looks like happens in this case and other cases. Yeah. And we're not looking to raise the pleading standards at all. We are looking back, really, at the pleading standard that the complaint can't be mere conclusions and that the facts must be plausibly pled. So I would go to this — I think it is implausibly pled that the — that the vaccines are produced using aborted human babies, for example. And then making that connection between the statements, because I think what we also have is a series of statements that don't have connection to them. They don't have — Well, they do to the plaintiffs because of their religious belief, arguably. But I don't think they've made that in the pleading. And whether they do it to the plaintiff or not, I think, is a question. And we haven't seen that. We don't see that plausibly pled in the complaints, that there is that connection between the religious belief and the inability to be — to be vaccinated in this case. So looking at the pleading standard, it isn't sufficient to say I'm religious and I don't want to be vaccinated and must be accommodated. And these complaints — Well, that's not what they said. What they said is, I hold the belief that abortion is an — is a moral evil, and I have a belief that the vaccines are developed using aborted fetuses. And stem cells had to come from some human source. And the human sources that were used to develop these particular vaccines actually came from aborted fetuses. That's a fact. I don't think you can automatically connect that, though, with a religious belief. I mean, after — the Pope has stated that they have — Well, what they tell you — they told you that's their religious belief. Well, now you're getting into the Pope said that — I think that's different. Yeah. But we have standards that say not all members of a — I don't know how the plaintiffs in this case should be bound by what the Pope says. Right. No, I agree that there's not a standard. I'm just — what I'm saying that there's not a requirement. I agree. There's not a requirement that everybody has to have the same belief in — You're just saying that they need to plead more where there is this ambiguity out there about different beliefs. They need to plead more to connect their — To be fair. Yes, Your Honor, to connect their beliefs with the vaccine requirement and the conflict and to show that conflict that actually exists. Would you address the exhaustion issue just briefly for me? I mean, why — Of course. Why was the district court right on those — on those two plaintiffs? Yeah. So the exhaustion issue, I think, is quite a straightforward one. Have we ever specifically said that there needs to be a subsequent complaint filed at termination? I think that the Richter — no, not the Richter case, sorry, Your Honor. I know. I'm switching gears pretty abruptly. Yeah, I'm just — yeah, it's the Richter case from 2012 comes, if not all the way on point, pretty darn close to on point to saying that because termination is a discrete act, and Richter's an Eighth Circuit case from 2012, because termination is a discrete act, if — that a charge would have to be filed after that termination actually is indicated. But here we had a termination threat that was referenced. In other words, the employer said, you don't do it, you're going to be fired. Yes. And I think that was included in the complaints that were filed in this case. Yes. Why isn't that enough? Isn't this what Judge Erickson referred to as just kind of a futile act here at that point? No, I think it's actually quite an easy distinction, Your Honor, that the — when someone is told if you don't do a certain thing, then your employment will ultimately be terminated. That warning, that if they don't do that thing, is a different act from the actual termination, which in this case did come later. That the plaintiffs were told later — or the appellants were told at a later date, now your last day of employment, you didn't do the thing we told you to do, and therefore your employment will end on a particular date. Counsel, we still have the reasonably related rule. Yes. After — after Amtrak case, we still do reasonably related. Is this reasonably related? Surely. No, I don't think that that rule applies to the discrete act, Your Honor, where there are — and where they happen afterwards. And even looking at the language of the statute, I think the language of the statute is really instructive here. It says that a charge shall be filed within the particular number of days after the alleged unlawful employment practice occurred. Here the unlawful employment practice is the communication of the termination of the employment of these individuals. And so that language — and that language is discussed in the Morgan case, which is a Supreme Court case. The Supreme Court clearly thought that that was critical and important. And I think the Richter case also follows that. Do you believe our cases after that, such as Wedow and there are a couple of others, you think they're basically wrong? No, Your Honor. Well, they say the reasonably related test survives in this circuit. Yes. In plain English. But I think that the reasonably related test applies to something different than the discrete act. So, for example, if something happens prior to the termination date, prior to the date of the actual charge, and that employee has included reasonably related issues in there, you don't have to put every single word in a charge. Charges, I think, have even less information. But, you know, the original statement in Nichols says grows out of or is reasonably related to. I know it's before Morgan. Yes, it is. But we said we still have the Nichols test. Yeah. And I don't think that we can point to a termination and say that it necessarily grows out of the performance management. I mean, if we looked at it this way, usually what happens, often what happens in employment cases is an employee is given a warning, and then maybe a second warning, and then they are fired. And they're told in their first warning, if you don't fix this, you will be fired. If we say, well, the termination grew out of that first and that second warning, then we're really changing. I think that would be a sea change in the case law. I think it would be in opposition to the Supreme Court case law, and it would change when the statute of limitations runs, when the limitations period runs on most employment cases. And this is not actually different from that. I mean, it is a situation where somebody is told, you're not following our policy. If you don't get in compliance with the policy, your employment will be terminated, which is not significantly different from other situations where someone is told, get on board with our policies, or you can't continue to work here. Okay. Thank you, counsel, for the argument. Thank you, Your Honor. Mr. Erickson. Thank you, Your Honor. Good enough. Thank you, Your Honor. The first thing that I want to point out is all the cases that they cite related to the exhaustion requirement have to do with different claims. Okay. Richter, their sex and race discrimination claims, and then the claim that came after was a retaliation claim, and that court found that they're different animals. Okay. If you look closely into all their cases, all of them find that. And the ones in the Eighth Circuit that find that they're similarly related, it was strange that she alleged that the termination was effective when it was communicated. Well, our notices were after the denial of the exemptions, and the fact that these folks were going to be terminated was communicated to them. Okay. You know, I think that what she really argues, it's made more plain in the brief, is that after we know that, you know, we said that the exhaustion requirement is equally applicable to discrete claims based on incidents that occur after the filing of the plaintiff's original charge. And so I think what she's arguing is that the termination is a discrete incident that occurred after the filing, and that, therefore, it needs to be exhausted separately. Why is she wrong? I think she's wrong because of WETO, because the substantial relation. The entire rationale around this area of case law is, are these allegations enough to allow the EEOC to find all the claims? Are you telling me that an allegation of religious discrimination and failure to accommodate and complaining about the notice saying that you're going to fire me wouldn't necessarily, the EEOC wouldn't find the fact that they had actually been fired? I mean, I think that that's, I think that all this parsing that's going on and all this talk of discrete acts, basically what it means is, I apologize. Counsel, you're over your time. So one more sentence. Okay. I would like to note the fact that Ms. Rubin did in her religious exemption request liken, she related the Gospel of Luke where it says if you don't need, if you're not sick, you don't need a doctor, to her religious position. I think that's enough at the Rule 12 stage. Thank you for your argument. Thank both counsel for their argument. The cases Ms. Laska called, all three of them, from 232994 to 2399, 2999, are all five, one, two, three, four, five, submitted for decision by the Court. Thank you.